IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 2:24-mj-211 |
| ) | |
| BRAD KENNETH SPAFFORD, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S MOTION FOR REVOCATION OF RELEASE ORDER
AND MEMORANDUM IN SUPPORT**

The United States of America, by and through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia, and E. Rebecca Gantt, Assistant United States Attorney, moves this Court to revoke the December 30, 2024, release order of defendant Brad Kenneth SPAFFORD pursuant to 18 U.S.C. § 3145(a)(1).

As explained below, the defendant poses an extreme danger to the community, which cannot be sufficiently mitigated by bond conditions. The defendant is charged via criminal complaint with unlawful possession of an unregistered short barrel rifle. During the execution of a search warrant at his home earlier this month, where the defendant lived with two young children, the Federal Bureau of Investigation (FBI) located not only the rifle but a stockpile of more than 150 homemade improvised explosive devices, assessed as pipe bombs. Some of these devices were marked "lethal." Most of the devices were found in a detached garage, where the FBI also found tools and manufacturing materials, including homemade fuses and pieces of PVC pipe. Several additional apparent pipe bombs were found in a backpack in the home's bedroom, completely unsecured.

The defendant also acknowledged to keeping a jar in his freezer of HMTD, an explosive material that is so unstable it can be exploded merely as a result of friction of temperature changes. Agent found this jar found unsecured next to food items with handwritten labeling marking it as "Dangerous" and "Do Not Touch."

The FBI also found a notebook in the defendant's home with extensive lists of explosives and "recipes" for how to make explosive materials (including HMTD and C-4, a military grade explosive) and destructive devices (including grenades).

The defendant has used pictures of the President for target practice, expressed support for political assassinations, and recently sought qualifications in sniper-rifle shooting at a local range. His release poses an extreme danger to those he lives with, the general community, and also the pretrial officers who will be tasked with periodically inspecting his residence for firearms including dangerous and unstable explosives. The government therefore respectfully submits that the release order should be revoked because no conditions are sufficient to mitigate these dangers.

The government has moved to stay the release order pending resolution of the instant motion, and has also requested an expedited transcript of the detention hearing and will promptly file a supplemental brief following receipt of the transcript.

## PROCEDURAL HISTORY

On December 10, 2024, the defendant was charged by single-count criminal complaint with Possession of a Firearm in Violation of the National Firearms Act, in violation of 26 U.S.C. § 5861(d). ECF Nos. 3 & 4. The defendant was arrested on December 17, 2024, ECF No. 13, and had his initial appearance the following day. ECF No. 8. The Honorable United States Magistrate Judge Douglas E. Miller granted the government's motion for temporary detention and set the detention hearing for December 23, 2024, and the preliminary hearing for January 3, 2025, at the

defendant's request. *Id.* At the parties' joint request, the preliminary hearing was reset for December 30, 2024. On December 23, 2024, the defendant appeared before Judge Miller, waived immediate detention, and requested that the detention hearing be delayed until December 30, 2024. ECF No. 15.

On December 30, 2024, the defendant appeared before the Honorable United States Magistrate Judge Lawrence R. Leonard for his preliminary and detention hearings. Following agent testimony and proffer by counsel, Judge Leonard found probable cause to support the complaint. Regarding detention, the United States argued that that the defendant should be detained because he posed a serious risk to the community. 18 U.S.C. § 3142. At the conclusion of the hearing, Judge Leonard denied the government's detention motion ordered the defendant released subject to conditions including electronic monitoring and release to a third party custodian, the defendant's mother.

At the conclusion of the hearing, the government noted it intended to seek review and revocation of the order of release in the district court, and requested that the release order be stayed until the conclusion of that matter. See 18 U.S.C. § 3145(a)(1). Judge Leonard orally indicated he would grant the stay request upon the government's filing later that day.

ARGUMENT

1. Legal Standard and Scope of Review

Whether to release a defendant on bond requires an examination of the factors set forth by Congress in Title 18, United States Code, Section 3142(g), including (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger that would be posed to the community by the person's release. The defendant shall be detained if "no

condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Here, given the defendant's longstanding ties to the community, the government is relying exclusively on the defendant's dangerousness, which it must demonstrate by clear and convincing evidence. 18 U.S.C. § 3142(f).

The district court's review of a magistrate judge's release order is *de novo*, and the district court "must make an independent determination of the proper pretrial detention or conditions of release." *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). The district court, however, need not re-hear evidence previously presented before the Magistrate Judge, and the rules of evidence do not apply at a pretrial detention hearing. 18 U.S.C. § 3142(f); *United States v. Martin*, 447 F. Supp. 3d 399, 402–03 (D. Md. 2020) (noting it is within the district court's discretion whether or not to hold a hearing or rule on the filings). Accordingly, it is permissible for the government or the defendant to introduce a transcript of the hearing conducted by the Magistrate Judge and then, if desired, supplement that transcript with additional evidence and/or proffer. The government herein attaches its admitted exhibits submitted at the detention hearing, and will file a supplemental brief promptly upon receipt of the hearing transcript, which it has requested be prepared on an expedited basis.

2. The Defendant Poses a Danger to the Community

The defendant's release poses a danger to the community that cannot be mitigated by any available conditions. This investigation began in early 2023 when a confidential human source (CHS), who was the defendant's neighbor and friend, reported that the defendant disfigured his hand in 2021 while working with a homemade explosive device, and was stockpiling weapons and homemade ammunition. ECF No. 4 ¶ 6; *see also* ECF No. 14 (Pretrial Report) at 3 (noting

defendant lost three fingers on his right hand). The CHS, who has a prior career in law enforcement, also observed the defendant in 2023 with an apparent short barrel rifle. *Id.* ¶ 7. The CHS also provided a photograph of the firearm, which he obtained from the defendant, in a "go box" in the back of a car. *Id.* ¶ 8. The CHS also noted that the defendant was using pictures of the President for target practice at shooting at a local range, stated that he believed political assassinations should be brought back, and that missing children in the news had been taken by the federal government to be trained as school shooters. The defendant also sent the CHS "memes" on social media expressing support for violence. **Exhibit 1**. The defendant and the CHS continued to correspond in 2024. Several weeks after the assassination attempt of then-Presidential candidate Donald Trump in Pennsylvania, the defendant stated that he hoped the shooter doesn't miss "Kamala."

In the fall of 2024, the defendant moved to a newly-purchased 20 acre farm in Isle of Wight, valued at $660,000 and in which he has over $300,000 in equity. ECF No. 14 at 3. The CHS visited the defendant there in October 2024 and was wearing a wire. ECF No. 4 ¶ 11. The defendant again stated that he had a short barrel rifle, and that the rifle was not registered because he does not believe in registration. *Id.* In a conversation with his wife who inquired about the defendant keeping a jar labeled dangerous in the freezer accessible to her and their children, the defendant also stated he had HMTD, which is a highly unstable primary explosive device that does not require the addition of any materials to detonate. The defendant also told the CHS he had ETN, a secondary explosive device. He also discussed fortifying the property with a 360-degree turret for a 50-caliber firearm on the roof, and noted how he could block the driveway with a vehicle so no other vehicles could access the property. On December 6, 2024, ATF confirmed that the defendant had no registrations of short barrel rifles or destructive devices. ECF No. 4 ¶ 12.

After learning about the potential presence of the highly explosive substance in a freezer at the defendant's home, the FBI obtained a criminal complaint and a search warrant for the defendant's 20-acre property, vehicles and person.  The arrest and search warrant execution, which required complex planning and travel by numerous FBI personnel including bomb technicians, occurred on December 17, 2024.  The defendant was interviewed and admitted to having a short barrel rifle and HMTD, but repeatedly denied having any explosive materials.  However, on a call to his wife during the interview, he stated that he would likely be going away for a lengthy period of time.  The defendant's wife was also interviewed.  She stated the defendant had firearms but they were all legal, and denied knowledge of him having any explosive materials, including in the freezer.

The FBI located a short barrel rifle in a safe in the master bedroom which was consistent in appearance to the one of which the CHS had provided a photograph in 2023.  **Exhibit 2**.  In addition, the FBI found more than 150 apparent explosive devices on the property, preliminarily assessed as the largest seizure by number of finished explosive devices in FBI history.  FBI bomb technicians, who x-rayed the devices on scene, assessed them as pipe bombs.  The majority were found in a detached garage, organized by color.  **Exhibit 3**.  Some were hand-labeled "lethal."  *Id.* at 3.  Some were preloaded into an apparent wearable vest.  *Id.* at 4.  In the garage were also found numerous tools and materials for manufacturing explosives, a home-made mortar, and riot gear. *Id.* at 5–8.  Finally, in a freezer in the garage, agents found a jar marked "Dangerous" and "Do Not Touch," matching the description of the HMTD, which was found next to food items.  **Exhibit 4**.

Additional pipe bombs were found completely unsecured in a backpack in the home's bedroom.  **Exhibit 6**.  The exterior of the backpack was labeled "#nolivesmatter."  *Id.*

The explosive materials and most of the apparent destructive devices were detonated on site as they were deemed too unstable to transport and maintain. However, several were retained for analysis; one has been analyzed by the FBI's explosive unit and deemed to be an improvised explosive device made of an outer hard plastic tube with an inner plastic tube; in between the tubes were metal spheres which "would enhance the fragmentation effect of the device upon its explosion." The lab concluded that the device was "capable of causing property damage, personal injury, and/or death."

Finally, inside the home was a notebook, the cover of which bore the insignia of the defendant's place of employment, Collins Machine Works, a machine shop. **Exhibit 5**. The notebook contained "recipes" for how to make explosive materials and devices, including grenades, and inventories of materials that can be used for such manufacture. *Id.*

The § 3142(g) factors weigh in favor of detention. Regarding the nature and circumstances of the offense, while the defendant is currently charged with a single count pertaining to his unlawful possession of an unregistered short-barrel rifle, 26 U.S.C. § 5861, which carries a statutory penalty of up to ten years in prison, 26 U.S.C. § 5871, he faces numerous additional potential charges for his unlawful possession of unregistered destructive devices, each of which carries an additional charge of ten years of imprisonment. The weight of the evidence on the existing charge is extremely strong, given the seizure of the short-barrel rifle and the defendant's prior recorded statement that it was unregistered because he does not believe in registration. As to the third factor, the history and characteristics of the person, the defendant lacks any criminal history and has long-standing ties to the community, steady employment, and substantial resources. While this factor generally weighs in the defendant's favor, particularly regarding any risk of flight, it does little to mitigate his danger to the community.

The government submits that the overwhelming factor is the fourth, namely "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). The defendant has the undisputed know-how, resources, and extreme inclination to manufacture and stockpile improvised explosive devices. Even after losing his own fingers as a result of his homemade explosive materials, he made the apparent remarkable decision to keep an extraordinarily dangerous explosive material in the home's freezer next to food items that could be accessed by the entire family. And while he is not known to have engaged in any apparent violence, he has certainly expressed interest in the same, through his manufacture of pipe bombs marked "lethal," his possession of riot gear and a vest loaded with pipe bombs, his support for political assassinations and use of the pictures of the President for target practice, and his belief that "no lives matter."

The imposed conditions, including electronic monitoring and the third-party custodian, defendant's mother, are simply insufficient to mitigate these extraordinary risks to public safety. They would do little to prevent him from procuring more firearms, including a sniper rifle which he possessed when the search warrant was executed. The defendant also has the skills and inclination to make dangerous destructive devices from easily available household items, including PVC pipe and chemicals. He has also shown no inclination follow rules, in light of his statements about not believing in registration of firearms and his repeated false statements to agents about the presence of explosive devices at his home. The release order unreasonably places the dangerous burden of policing the defendant to ensure he does not again make volatile explosive materials on both his mother and the pretrial officers who must periodically inspect his residence.

CONCLUSION

The defendant poses a risk of danger to the community which cannot be sufficiently mitigated by any conditions, and preclude him being granted bail.  For these as well the reasons to be submitted in a supplemental brief once the transcript is prepared, the government respectfully submits that the order of release should be revoked.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:       /s/
E. Rebecca Gantt
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Phone: (757) 441-6331
E-Mail: rebecca.gantt@usdoj.gov